(153 App. Div. 474.)

### MACPHERSON v. BUICK MOTOR CO.

(Supreme Court, Appellate Division, Third Department. November 13, 1912.)

NEGLIGENCE (§ 27\*)—FURNISHING DEFECTIVE GOODS—LIABILITY OF MANUFAC-
  TURER—AUTOMOBILES.

 If the spokes in the wheels of an automobile purchased for use in populous communities were of inferior hickory wood, and such inferiority could have been determined prior to manufacture by proper tests, and by reason thereof the running of the automobile at an ordinary rate of speed would be dangerous to persons occupying it, the manufacturer was liable for an injury to its purchaser, caused by the breaking of such spokes while he was using the car in ordinary travel.

 [Ed. Note.—For other cases, see Negligence, Cent. Dig. § 25; Dec. Dig. § 27.\*]

Appeal from Trial Term, Saratoga County.

Action by Donald C. MacPherson against the Buick Motor Company. From a judgment of nonsuit, entered at the close of plaintiff's case, he appeals. Reversed, and new trial granted.

Argued before SMITH, P. J., and KELLOGG, HOUGHTON, BETTS, and LYON, JJ.

Edgar T. Brackett, of Saratoga Springs (Harold H. Corbin, of Saratoga Springs, of counsel), for appellant.

Frederick E. Wadhams, of Albany (William Van Dyke, of Detroit, Mich., of counsel), for appellee.

BETTS, J. The plaintiff was the owner of an automobile, known as a "Model 10 runabout," purchased by him of Close Bros., who had

purchased the same from the defendant, the manufacturer thereof. While operating said automobile upon the public highway, one of the rear wheels collapsed, by which plaintiff was thrown out and injured. He brought this action against the defendant, as manufacturer, alleging that the defendant was careless and negligent in the manufacture of said automobile, and failed to use due care in its construction, and in testing the same and the materials of which it was made, and that it was constructed for the purpose of running at considerable speed upon ordinary highways, and for that purpose it was necessary that good and strong and proper materials should be used in its wheels, and that such materials used in the wheels should be sufficiently inspected and tested, to show that they were strong and durable and safe, and that the defendant negligently put wheels upon said machine in question, the spokes of which were of inferior and unsuitable and unsafe timber, and which material was not sound, but was brittle, or brash, and that, while plaintiff was carefully running and operating said machine, the spokes of one of the wheels of said machine gave way and broke, and the machine was let down and overturned, because of the breaking of said spokes, and the plaintiff was thrown out and injured.

The defendant's answer does not deny but that in the year 1909 it sold and delivered to Close Bros. an automobile, known as "Model 10 runabout," and does not deny but that the said automobile referred to in the complaint was constructed to run at considerable speed on ordinary highways, and that it was necessary that good and strong material should be used in the wheels on said machine. It alleges that there are no contractual relations between the plaintiff and the defendant, and for a further defense alleges that the said automobile was constructed by the defendant out of parts some of which were made exclusively by the defendant and other parts used upon the wheels of the car referred to in the complaint were not manufactured by the defendant, but were manufactured by the Imperial Wheel Company, of Flint, Mich., a reputable manufacturer and dealer, and were purchased by the defendant from the said Imperial Wheel Company.

The case came on for trial, and at the close of the plaintiff's case the defendant's motion for a nonsuit was granted by the court, from which the plaintiff appeals.

It appeared upon the trial that the plaintiff, who is a resident of the village of Galway, Saratoga county, purchased this automobile of Close Bros. (to whom the defendant had sold it), of the city of Schenectady; that it was a Model 10 Buick 1910 runabout, with a seat for two in front, with a rumble seat for one on the box behind. The horse power was 22½, and it was rated to go 50 miles per hour, and its weight was from 1,500 to 1,800 pounds. Plaintiff used the automobile during the summer and fall of 1910. He next used it again in May, 1911, and used it intermittently, caring for it himself, and never observing any breaks in the spokes, until July 25, 1911. On that day he left Galway, and proceeded to the residence of a man by the name of John E. Carr, an invalid, and took John E. Carr

in the seat with him, and a relative of Carr, Charles E. Carr, in the rumble seat behind, starting to go to Saratoga Springs to leave John E., who was ill, at a hospital. They had gone through Ballston Spa, and were near Saratoga Springs, running about 15 miles an hour, and near the middle of the road, near the Standard Oil Company's plant. Just outside of Saratoga Springs, and some 250 or 300 feet back of where the accident occurrred, the hind wheel either ran in a rut or in some way skidded some in the street, the plaintiff, who was running the machine, threw off the power and turned the machine a little to the left to right it, then he put on the power again and pulled back towards the right-hand side of the road, the proper side to proceed. As he was turning to the right, he heard a smash, and looked back, and the rear left-hand side of the car was going down, and it did go down six or eight inches to the ground; the axle scraping on the road. Immediately looking forward again, the automobile turned in towards a telephone pole on the right of the road. Plaintiff gave the steering wheel a turn to the left to avoid the pole, but the end of the frame hit it, and the car swung around, and it is claimed turned completely around, and ran on the right side of the road, facing back towards Ballston Spa, from which they had been coming. This was all done quickly. At the time of the accident the machine was not going as fast as 15 miles an hour. Plaintiff was found, after the fall, under the hind axle of the machine. He was released with some difficulty, and had received the injuries for which the action was brought. The left hind wheel was the one that collapsed. It was some 30 inches in diameter and had 12 spokes, all of which were broken out.

There was evidence given from which the jury might have found that these spokes were nearly all of them of inferior hickory wood, and were brittle or brash, some of them worse than others, and not of first quality any of them, and that there were tests by which the inferiority of this wood could have been discovered prior to its manufacture and being put in this wheel; that different kinds of tests were practicable, and would have discovered the inferiority of this wood, and the fact that it was not safe for the use to which it was put to. There was evidence from which the jury might have found that the running of this automobile at an ordinary rate of speed upon an ordinary country road, or running it at the rate for which it was rated to be run, would be dangerous to persons riding in it and occupying it. It was occupied by three persons only at the time, and the testimony was that it was not going at a rapid rate of speed, and that nothing had happened to put it to an extraordinary test, or put any extraordinary strain upon it. This automobile was manufactured and sold, intended to be used upon the public highways or streets. It was sold to a firm in Schenectady. Schenectady is a large city, and within a radius of a few miles, a distance likely to be reached by the owner of an automobile, there are many other cities, large and small, so that the manufacturer sold this car with a reasonable expectation that it would be used in and about a city district, or a district containing many cities. Galway is about 17 miles from Schenectady.

An accident (similar to the one that did happen) in the streets of any city might easily injure many persons other than the immediate occupants of the automobile. An accident at the place in question, the approach to a populous village, a summer resort, in the month of July, when people were accustomed to go 'to that village as a health resort or for pleasure in considerable numbers, might easily be attended with serious injury to other automobile users of the highway, or persons walking thereon or driving thereon with horses and wagons, so that the use which it was intended that this automobile should be put to was a public use, to be used upon the highways which were open to all the people. The automobile was likely to be used in a city or populous village, or upon state roads much frequented by automobile users and other people, and hence the injuries that might be apprehended from manufacturing and selling an insecure vehicle, a vehicle composed of inferior, untested materials, would be to other people as well as to the actual occupants of the car.

Referring to the case of Statler v. Ray Manufacturing Co., 125 App. Div. 69, 109 N. Y. Supp. 172, it appeared that the defendant, a manufacturer, sold a large coffee urn, which was to be used in hotels and restaurants. On account of improper workmanship and negligence of the manufacturer, one of these coffee urns, which was used in a hotel or restaurant, exploded, the bottom being partially driven out by force of steam and water, and the injury to plaintiff was thus caused. The plaintiff had no contractual relations whatever with the manufacturer. The defendant had sold it to a jobber, who in turn had sold it to a company of which plaintiff was an officer. Plaintiff brought an action in negligence, claiming a liability of the manufacturer for negligent construction, and obtained a judgment, which was affirmed at the Appellate Division. The headnote is:

"In such case the negligence is based upon a failure to perform a duty owed to all persons in whose presence the boiler is to be used, not upon a duty owed to the purchasers only."

It will be seen that that case is one degree removed from the case with which we are dealing, as here the purchaser from the jobber was the person who was injured, and who is the plaintiff in this action. Upon appeal to the Court of Appeals (195 N. Y. 478–481, 88 N. E. 1063, 1064), that court said:

"We think, further, that there was evidence which permitted a jury to say that the defendant, knowing the uses for which the urn was intended when it marketed the same, was guilty of, and, of course, chargeable with knowledge of, defective and unsafe construction. This leaves on this branch of the case simply the question whether a manufacturer and vendor of such an inherently dangerous appliance as this was may be made liable to a third party on the theory invoked by plaintiff, and we think that this question must be regarded as settled in the latter's favor by the following authorities: Thomas v. Winchester, 6 N. Y. 397, 57 Am. Dec. 455; Coughtry v. Globe Woolen Co., 56 N. Y. 124, 15 Am. Rep. 387; Devlin v. Smith, 89 N. Y. 470, 474–477, 42 Am. Rep. 311; Davies v. Pelham Hod Elevating Co., 146 N. Y. 363, 41 N. E. 88; Torgesen v. Schultz, 192 N. Y. 156, 84 N. E. 956, 18 L. R. A. (N. S.) 726, 127 Am. St. Rep. 894; Connors v. Great Northern Elevator Co., 90 App. Div. 311, 85 N. Y. Supp. 644, affirmed 180 N. Y. 509, 72

N. E. 1140; Kahner v. Otis Elevator Co., 96 App. Div. 169, 89 N. Y. Supp. 185; Huset v. Case Threshing Machine Co., 120 Fed. 865, 872, 57 C. C. A. 237, 61 L. R. A. 303; Keep v. Nat. Tube Co. (C. C.) 154 Fed. 121, 127; Marquardt v. Ball Engine Co., 122 Fed. 374, 58 C. C. A. 462; Thompson on Negligence, § 825 et seq."

The court further said:

"While thus we should not hesitate to affirm the judgment on its general merits, we find that errors were committed in rulings on evidence which are so pronounced, and in the aggregate, at least, so important and prejudicial to the rights of the defendant, that they cannot be overlooked"

—and reversed the judgment on account of errors in the admission of testimony. See, also, 29 Cyc. 484, where it is stated:

"Liability Based on Knowledge that the Thing Supplied, if Defective, will be Dangerous.—One who supplies a thing for such use by others that it is obvious that any defect will be likely to result in injury to those so using it is liable to any person who, using it properly for the purpose for which it is supplied, is injured by its defective condition. The doctrine of invitation has been invoked as a ground of liability in such cases, proceeding upon the theory that he who furnishes a thing for a certain use by others invites others to use it, and is therefore bound to make it safe for such purpose."

See, also, Connors v. Great Northern Elevator Co., 90 App. Div. 311–313, 85 N. Y. Supp. 644.

I think this case falls within the rule established by the Court of Appeals in the Statler Case, quoted from, and the numerous cases quoted by that court, and I think that the question at issue should have been, under proper instructions, submitted to the jury.

I therefore favor a reversal of the judgment, with a new trial to plaintiff; costs to abide the event. All concur; HOUGHTON, J., in memorandum.

HOUGHTON, J. (concurring). While much can be said upon the proposition that an automobile traveling at a speed of 50 miles an hour, which the machine in question was capable of making, would be inherently dangerous, not only to the occupants, but to a large number of fellow travelers upon the highway, if one of its wheels should collapse, I do not place my concurrence in a reversal of the judgment upon the ground that the defendant put a defective article upon the market which was inherently dangerous. It seems to me that the plaintiff, by his proof, made a prima facie case of negligence on the part of the defendant, through failure to properly test the strength of the wheel which collapsed. If the defendant had put a wheel on the automobile in question, designed to run at a speed up to 50 miles an hour, the spokes of which it knew were made of improper or defective wood, and had covered them up with paint and varnish, there would be no question as to its liability, at least to a purchaser, although no contract relation might exist between it and him. In such case it would be conclusively presumed that the defendant knew that defective spokes would not stand the necessary strain incident to such speed, and the covering of the defects with paint and varnish, and the actual or implied representation that they were fit to stand the strain, would constitute a fraud upon the purchaser and user, render-

ing the manufacturer liable to the purchaser or user for the injuries resulting from such known defects, under the principle enunciated in Kuelling v. Lean Manufacturing Company, 183 N. Y. 78, 75 N. E. 1098, 2 L. R. A. (N. S.) 303, 111 Am. St. Rep. 691, 5 Ann. Cas. 124.

The defendant claims, and alleges by its answer, that it purchased its wheels from a reputable manufacturer. If we assume this to be so, although there is no proof on the subject, still it cannot shield itself because the manufacturer was a reputable one. Whether it made the wheels itself, or purchased them from another, it was bound to make some reasonable test of the suitability of the wood before it placed such wheels upon its machines and put them on the market ready for use. If the defendant itself made the wheels, some defects in the wood would be disclosed in the course of manufacture; and if it bought them from another, it must use some reasonable means of ascertaining whether they were made of proper material. It seems to me that Torgensen v. Shultz, 192 N. Y. 156, 84 N. E. 956, 18 L. R. A. (N. S.) 726, 127 Am. St. Rep. 894, is a quite sufficient authority to uphold the plaintiff's contention that he made a prima facie case of negligence through failure to properly test the strength of the wheel. In that case the siphons were purchased by the defendant from a manufacturer in Austria. For the purpose of showing that the defendant knew that when such siphons were filled with aërated water the pressure was such that, if there was any defect in the glass, the siphon would burst if suddenly exposed to extreme cold, the plaintiff proved that the defendant made a test for the purpose of discovering any defects by suddenly plunging the filled siphons into ice water and allowing them to remain for a definite time. Such plunging exposed the siphons to the same coldness on all sides. It was assumed, however, that the defendant must have known that in ordinary household use siphons were often put next to the ice, so that only one side would be exposed to the extreme cold. The plaintiff proved by a series of experiments with a considerable number of siphons filled by the defendant that a comparatively large percentage burst when the siphon was placed with only one side to a cake of ice. A nonsuit was had in the lower courts, but the Court of Appeals said that it was a question for the jury to determine whether or not, in view of the ordinary use of the siphons and the ordinary manner of cooling them, the defendant had made a sufficient test to determine whether or not they would burst when so used.

In the case at bar, assuming the defendant's claim to be the fact, it purchased its wheels from the Imperial Wheel Company, a reputable manufacturer. The defendant knew that when its machine was run at high speed the wheel was likely to collapse, if its spokes were made of defective wood. The plaintiff proved that ordinary inspection of the wood before it was covered with paint and varnish would reveal much of the defect which existed. The plaintiff also proved that another reputable manufacturer of automobiles used a hydraulic pressure test. If the wheels were not painted when they were purchased by the defendant, according to the plaintiff's proof, some of the defects which were shown to exist in the broken spokes would

have been disclosed by a mere inspection. If they were painted, so that such defects were covered, a pressure test would probably have revealed the weakness. Possibly the defendant may be able to show that it made all the inspection and tests that it could reasonably be required to do, and that therefore it was not negligent. Whatever the fact may be, it was a question for the jury to determine whether the accident was caused through lack of proper inspection or test, or whether it was brought about through improper management of the car by the plaintiff, or weakness of the wheel incident to excessive use.

For these reasons, I concur in a reversal of the judgment and the granting of a new trial.